FILED
SUPERIOR COURT
OF GUAM

2025 MAR 12 PM 5: 22

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT OF GUAM

PEOPLE OF GUAM,

vs.

SUNNI KLARISA VARGAS,
*aka* Linda Belinda
*aka* Belinda Vargas
DOB: 10/09/1990

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CRIMINAL CASE NO. **CF0727-24**
GPD Report No. 24-24735

**DECISION & ORDER
RE. DEFENDANT'S MOTION TO
SUPPRESS**

This matter came before the Honorable Alberto E. Tolentino on December 12, 2024, for a Motion Hearing. Defendant Sunni Klarisa Vargas ("Defendant") was present with counsel Alternate Public Defender Ana Maria Gayle. Assistant Attorney General Matthew Wermager was present for the People of Guam ("People"). Following the hearing, the court took the matter under advisement pursuant to Supreme Court of Guam Administrative Rule 06-001, CVR 7.l(e)(6)(A) and CR1.1 of the Local Rules of the Superior Court of Guam. Having duly considered the parties' briefings, oral arguments, and the applicable law, the court now issues this Decision and Order **GRANTING** the Defendant's Motion to Suppress.

\\

\\

\\

\\

# BACKGROUND

## A. Allegations against Defendant Vargas in the Magistrate's Complaint

On October 20, 2024, Guam Police Department ("GPD") Officers conducted a check of the "Guma Trankilidat parking area" at about 2:30 a.m. Affidavit to Magistrate's Compl. (Oct. 21, 2024). During this check, GPD officers observed a female in the driver's seat of a vehicle who "appeared to be rummaging through items." *Id.* Officers also observed that the vehicle was running and looked a mess inside. *Id.* Although the female stated to GPD officers that her name was "Linda Belinda," a GPD Enterprise Law Enforcement Mobile photo and tattoo identification identified her as "Sunni Klarisa Vargas DOB: 10/09/1990" – the Defendant in this case. *Id.* When Officer Sumagaysay asked her about the vehicle's owner, the Defendant responded that "Dan" was the owner. *Id.* In a rush, she exited the vehicle and began walking away from the officers. *Id.* When Officer Sumagaysay informed her that she was not free to leave, and requested for her driver's license, she continued walking away. *Id.*

While Officer Sumagaysay followed the Defendant, Officer Pangelinan remained with the vehicle. *See* Affidavit (Oct. 21, 2024). Looking through the driver's side window of the vehicle, Officer Pangelinan "observed in plain view a glass pipe with a bulbous end within the open compartment of the center console area." *Id.* Upon a further check of the area where the pipe was located, the officer found a "clear resealable plastic baggie containing a crystalline substance suspected to be methamphetamine." *Id.* Using a sample of the substance from this plastic baggie, the officer "conducted a NARK II test which yielded a presumptive positive for methamphetamine." *Id.* GPD officers arrested the Defendant at 2:55 a.m. *Id.*

Based on the events above, the Defendant was charged with POSSESSION OF A SCHEDULE II CONTROLLED SUBSTANCE (As a 3rd Degree Felony). *See* Indictment (Oct. 28, 2024).

**B. Defendant Vargas' Motion to Suppress**

The Defendant asserted her right to speedy trial at Arraignment on November 7, 2024. *See* Assertion (Nov. 12, 2024). She subsequently filed her Motion to Suppress Evidence ("Motion") on November 20, 2024.[1] The court scheduled a Motion Hearing for December 12, 2024, to hear the parties' oral argument and testimony from the GPD officers involved this case. *See* Notice (Nov. 25, 2024). Because the People did not file its Opposition by the December 4th deadline, the People filed a Motion for Leave of Court to file an Untimely Opposition on December 12, 2024. *See* Ppl.'s Mot. Leave (Dec. 12, 2024). Attached to its Motion for Leave of Court was the People's Opposition to the Motion. *Id.*

**C. Defendant Vargas' Suppression Hearing**

At the evidentiary hearing on the Motion to Suppress ("Suppression Hearing"), the court first addressed the issue of whether to grant the People leave of court to file its Opposition. *See* Suppression H'rg Mins. at 3:10:36 – 14:58PM (Dec. 12, 2024). Pursuant to 8 GCA § 65.45, the court did not allow the People to make an oral argument before the court on the Motion.[2] *Id.* at 3:14:59 – 17:30PM. The court only permitted the People to lay foundation of the events in this case by questioning the subpoenaed GPD Officers. *Id.* Upon the court's ruling, the court heard

---

[1] The Guam Supreme Court acknowledged that delays for the benefit of the defendant constitute good cause for tolling the speedy trial clock. *See Ungacta v. Superior Court of Guam*, 2013 Guam 29 (arguing that "delays caused by, or for the benefit of the defendant constitute good cause for speedy trial purposes."). Because suppressing evidence in this case would benefit the Defendant, the Defendant's speedy trial clock tolled as of November 20, 2024.

[2] If a motion is untimely filed, the court may allow the filing of motions beyond the time limit previously set by the court. *See* 8 GCA § 65.45 ("Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to § 65.15, or prior to any extension thereof made by the court, shall constitute a waiver thereof, but the court for cause shown may grant relief from the waiver.")

testimony from two out of three[3] GPD Officers involved in the events leading up to the Defendant's arrest on October 20, 2024: Officer Sammy J. Sumagaysay ("Sumagaysay") and Officer Donny Topasna Pangelinan ("Pangelinan").

### 1. Testimony of the Initial Stop

While patrolling the Tamuning/Tumon village area at 2:30 a.m. on October 20, 2024, Sumagaysay drove his patrol vehicle into Guma Trankilidat[4] with Officers Pangelinan and Togawa.[5] *See* Suppression H'rg Mins. at 3:32:50 – 35:30PM (Dec. 12, 2024). Upon driving into Guma Trankilidat's parking lot area, the officers observed a vehicle parked in a handicapped parking stall with the Defendant in the driver's seat. *Id.* at 3:23:22 – 23:27PM. Sumagaysay testified that he flashed his patrol vehicle's headlights on high beam and drove up behind the vehicle in question. *Id.* at 3:21:50 – 22:40PM. Sumagaysay parked his patrol vehicle at an angle behind the vehicle before turning it off. *Id.* at 3:42:24 – 42:58PM. Pangelinan later testified that parking GPD patrol vehicles directly behind a vehicle in question is considered normal when an officer wants to check that vehicle in question. *Id.* at 4:16:30 – 17:20PM.

Sumagaysay testified that he "called in the license plate" upon parking his patrol vehicle. Suppression H'rg Mins. at 3:43:02 – 46:24PM (Dec. 12, 2024). Although Pangelinan did not call in the license plate himself, he reasoned that Sumagaysay did so "to make sure that there was no burglary or theft going on." *Id.* at 4:05:38 – 06:06PM. Neither officer could testify as to the results

---

[3] GPD Officer Togawa ("Togawa") was the third officer who was present throughout these events leading up to the Defendant's arrest. Although he was not called to testify, both officers testified about his involvement, which is sufficient for the court's consideration.

[4] *See* Suppression H'rg Mins. at 3:35:47 – 37:37PM (Dec. 12, 2024) (testifying that Guma Trankilidat is Government of Guam housing for the elderly; not a business).

[5] Although a patrol vehicle should seat two GPD officers in the front and an arrestee in the back, Pangelinan testified that he sat in the back of the patrol vehicle due to a shortage of vehicles at the time they were out patrolling, which was not unusual. *See* Suppression H'rg Mins. at 4:12:49 – 13:12PM (Dec. 12, 2024).

of the call, such as the name of the car's registered owner or if someone reported it as stolen. *Id.* at 4:43:02 – 46:24PM.

Before speaking to the Defendant, the officers made some initial observations. After using his report to refresh his recollection, Sumagaysay testified that the car was running with the driver's side window rolled down. *See* Suppression H'rg Mins. at 3:47:43 – 48:25PM (Dec. 12, 2024). Although Sumagaysay could not confirm on the stand if the driver's side door was open, Pangelinan confirmed that it was open. *Id.* at 4:15:18 – 16:08PM. The officers also noticed the Defendant rummaging through the car and grabbing a cat. *Id.* at 3:23:43 – 24:01PM; 4:05:56 – 06:06PM. According to Sumagaysay's testimony, he asked the Defendant for identification upon approaching her. *Id.* at 3:24:15 – 24:20PM. After indicating she had none, the Defendant continued reaching around the car and grabbed the cat before exiting the vehicle. *Id.* at 3:24:24 – 24:33PM. At the time, the only identification she provided to Sumagaysay was the name "Linda Belinda." *Id.* at 3:24:46 – 24:57PM.

Despite Sumagaysay's requests for further identification, the Defendant ignored them and continued walking away from the officers. *See* Suppression H'rg Mins. at 3:25:04 – 25:20PM (Dec. 12, 2024). According to his police report, Sumagaysay told the Defendant, "Stop, you cannot leave." *Id.* at 3:50:00 – 50:47PM. At some point, he "informed her that she was not free to go and asked for her license." *Id.* at 3:51:52 – 52:16PM. Meanwhile, Togawa was watching Sumagaysay's back as both officers followed her. *Id.* at 3:50:48 – 51:06PM. While the Defendant was walking away from the officers, she shouted that "Dan was in the distance." *Id.* at 3:25:16 – 25:34PM. She also stated, "I can see the door." *Id.* at 3:51:52 – 52:16PM. When Sumagaysay asked if she stayed at building K, the Defendant said, "No, I stay in Maite." *Id.*

\\

### 2. Testimony of the Search

While Sumagaysay and Togawa were following the Defendant, Pangelinan approached the vehicle in question. *See* Suppression H'rg Mins. at 4:06:43 – 07:07PM (Dec. 12, 2024). Although the vehicle's driver's side door was now closed, Pangelinan noticed that the window was down. *Id.* at 4:19:40 – 20:08PM. Through the open driver's side window, he saw a pipe with a bulbous end in "plain view."[6] *Id.* at 4:01:50 – 07:07PM. Specifically, Pangelinan testified that the pipe was located inside the "car's center console compartment, which was open." *Id.* at 4:20:10 – 21:23PM. Pangelinan then entered the vehicle to remove the pipe, describing it as a "cylindrical, glass pipe with a bulbous end." *Id.* at 4:07:56 – 24:37PM. Further check of the pipe showed that the pipe contained residue. *Id.* at 4:24:40 – 24:43PM. After removing the pipe from this compartment, he also noticed a resealable baggie containing a crystalline substance in that same compartment. *Id.* at 4:08:25 – 08:37PM. Pangelinan notified the other officers of his findings "almost immediately." *Id.* at 4:08:45 – 08:53PM.

### 3. Testimony of the Defendant's Arrest

Although Sumagaysay instructed her multiple times to stop, the Defendant refused, leading him to handcuff her "under the awning in front of the elderly home." Suppression H'rg Mins. at 3:26:40 – 27:06PM (Dec. 12, 2024). Although Sumagaysay could not recall an exact or approximate time, he testified that he handcuffed the Defendant before Pangelinan informed him about the evidence found in plain view. *Id.* at 3:29:10 – 29:27PM; 3:53:12 – 53:41PM. In contrast to Sumagaysay's testimony, Pangelinan testified that he "highly doubted that she was in cuffs prior to him informing the officers." *Id.* at 4:08:54 – 09:24PM. According to Pangelinan,

---

[6] Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 13 S. Ct. 2130 (1993).

Sumagaysay arrested the Defendant after he and Togawa read the Defendant her *Miranda*[7] rights and questioned her. *Id.* After her arrest, Pangelinan tested the suspected methamphetamine using, which yielded presumptive positive for methamphetamine. *Id.* at 4:09:25 – 10:02PM; 4:26:04 – 26:22PM. Although he testified about field testing the suspected methamphetamine, Pangelinan later testified that he was unsure whether he conducted the test at the scene or at the precinct. *Id.*

Pangelinan confiscated the evidence roughly around 2:50 a.m. *See* Suppression H'rg Mins. at 4:10:39 – 11:16PM (Dec. 12, 2024). He testified that the "entire investigation from observation until final confiscation of the drugs was roughly 20 minutes." *Id.* After confiscating the evidence, the three officers left the scene with the Defendant. *Id.* at 4:11:35 – 12:06PM.

### 4. Defendant's Relief Sought

At the end of questioning, the Defendant argued that GPD officers seized her in violation of the Stop and Frisk Rule of fifteen (15) minutes. *See* Suppression H'rg Mins. at 4:35:38 – 35:53PM (Dec. 12, 2024). Because of this, she seeks the suppression of anything found after the initial illegal stop. *Id.* at 4:35:38 – 35:53PM. Based on the court's earlier ruling, the People could not make any oral argument on the testimony and evidence presented.[8] The court then took the matter under advisement. *Id.* at 4:39:40 – 39:45PM.

\\

\\

---

[7] Under the Fifth Amendment, "No person shall be compelled in any criminal case to be a witness against [themselves]." U.S. Const. Amend. V. *Miranda v. Arizona*, 384 US 436 (1966), protects an individual's fifth amendment right against self-incrimination by preventing the admissibility of statements made while a defendant was in custody during an interrogation. However, such statements may be admissible as evidence so long as law enforcement inform the defendant of their right to remain silent and their right to speak with an attorney before and during the custodial interrogation; and the defendant either exercises these rights or knowingly, voluntarily, and intelligently waives them. *Miranda v. Arizona*, 384 US 436 (1966).

[8] Despite the People's failure to timely file its Opposition in this case, the court still has an obligation to analyze the merits of the issue before it. In *Petition of Quitugua v. Flores*, the Supreme Court of Guam held that "the failure to file a written opposition, the filing of a notice non-opposition, or the disregard of untimely filed papers" does not relieve the lower court of its obligation to consider the merits of a motion before rendering its decision. *Petition of Quitugua v. Flores*, 2004 Guam 19 ¶¶ 27–28.

## DISCUSSION

The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, [and] shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. The Fourth Amendment's protections against unreasonable searches and seizures apply to Guam through § 1421b(c) of the Organic Act of Guam. *See People v. Yerten*, 2021 Guam 8 ¶ 17 (citing *People v. Johnson*, 1997 Guam 9 ¶ 4).

### A. Guam Police Department Officers seized Defendant Vargas at or around 2:50 a.m.

The Defendant argues that GPD unlawfully seized her for longer than the fifteen minutes allowed under 8 GCA § 30.30; beginning when Officer Sumagaysay observed her at 2:30 a.m. *See* Def.'s Mot. Suppress at 4–5 (Nov. 20, 2024). Under 8 GCA § 30.30, a person's detention shall not be "longer than is reasonably necessary to effect the purposes of that section, and *in no event* longer than fifteen (15) minutes." 8 GCA § 30.30 (emphasis added). Further, "[s]uch detention shall not extend beyond the place where it was first effected or the immediate vicinity thereof." *Id.* To determine whether the Defendant was seized in violation of 8 GCA § 30.30, the court must analyze the totality of the circumstances surrounding the events leading up to her eventual arrest at 2:55 a.m.

The United States Supreme Court has long held that "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *People v. Cundiff*, 2006 Guam 12 ¶ 21 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). For instance, a reasonable person would not believe they are free to leave through a police

officer's use of physical force or show of authority to restrict a person's ability to walk away. *See People v. Chargualaf,* 2001 Guam 1 ¶ 21.

As mentioned earlier, Sumagaysay turned off his patrol vehicle, parking it directly behind the vehicle the Defendant was found in. This vehicle was still running with its driver-side door open. Should the Defendant want to drive out of the Guma Trankilidat parking lot, she could not do so safely without crashing into the patrol vehicle. Although this alone may be a sufficient seizure if conducting a traffic stop, Pangelinan testified that the officers did not conduct a traffic stop on the Defendant. *See* Suppression H'rg Mins. at 4:17:39 – 17:42PM (Dec. 12, 2024).

While all three officers did not make their initial approach at once, Sumagaysay and Togawa both approached the driver's side of the vehicle, where the Defendant was seated and reaching around the car. Sumagaysay was the only officer who interacted with the Defendant. Meanwhile, Togawa watched Sumagaysay's back, serving as Sumagaysay's back-up without interacting with the Defendant. *See* Suppression H'rg Mins. at 3:50:48 – 51:06PM (Dec. 12, 2024). The manner of the officers' approach to the Defendant is likely not enough to exhibit a "show of authority" that would make a reasonable person feel that they were not free to leave.

Although the Defendant exited the vehicle, both Sumgaysay and Togawa continued following her to obtain further identification after the Defendant informed Sumagaysay that she had none on her. While following the Defendant on foot, Sumagaysay told the Defendant at different times: (1) "Stop, you cannot leave"[9] and (2) she was not free to go and asked for her license.[10] Despite these statements, the Defendant's actions – leaving the officers at the vehicle and walking some distance away from them – would cause a reasonable person to believe that the officers were not restricting her freedom of movement at his time. Notably, the amount of distance

---

[9] Suppression H'rg Mins. at 3:50:00 – 50:47PM (Dec. 12, 2024).
[10] *Id.* at 3:51:52 – 52:16PM.

the Defendant traveled between the location of the officer's initial approach (the handicapped-accessible parking stall) and the point of detention (under the awning in front of the elderly home) show that she still felt free to leave and was not immediately detained upon the officers' initial approach.

Although Sumagaysay could not recall on the stand, the Affidavit of Probable Cause stated that he arrested her at 2:55 a.m. *See* Magistrate's Compl. (Oct. 21, 2024). This timestamp aligns with Pangelinan's testimony that he confiscated the evidence roughly around 2:50 a.m., which occurred either after or during the time Sumagaysay eventually made the arrest.[11]

Looking at the totality of these circumstances, a reasonable person would have felt free to leave at or around 2:30 a.m. Further, a reasonable person would not have felt free to leave until Officer Sumagaysay handcuffed the Defendant at approximately 2:50 a.m. Therefore, the Defendant's seizure did not begin until this time; and no violation of 8 GCA § 30.30 occurred.

## B. Guam Police Department Officers lacked reasonable suspicion to detain Defendant Vargas as permitted under 8 GCA § 30.10.

Under Guam's Stop and Frisk Act, a peace officer may detain any person "under circumstances which reasonably indicate that such person has committed, is committing or is about to commit a criminal offense." 8 GCA § 30.10. Under 8 GCA § 30.20:

> Detention pursuant to § 30.10 shall be for the purpose of ascertaining the identity of the person detained and the circumstances surrounding his presence abroad which lead the officer to believe that he had committed, was committing, or was about to commit a criminal offense, but such person shall not be compelled to answer any inquiry of the peace officer.

---

[11] Although Pangelinan could not recall whether the officers handcuffed the Defendant before notifying the other officers of the suspected methamphetamine in the vehicle, he "highly doubted that she was in cuffs prior to him informing the officers." Suppression H'rg Mins. at 4:08:54 – 10:02PM (Dec. 12, 2024). In response, the officers proceeded with *Miranda* rights and questioning and eventually making an arrest. *Id.*

When analyzing the legality of seizures, such as detentions under Guam's Stop and Frisk Act, the court utilizes the same standard of reasonable suspicion articulated in the United States Supreme Court case *Terry v. Ohio*. *See People v. Taman*, 2013 Guam 22 ¶ 21. In *Terry*, the Court found that "reasonable suspicion" existed:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety....

*Terry v. Ohio*, 392 U.S. 1, 30 (1968). To determine whether such reasonable suspicion exists, courts review the contents and reliability of the information in the police's possession, through the perspective of "an objectively reasonable police officer." *Yerten*, 2021 Guam 8 ¶ 17 (internal citations omitted).

When Sumagaysay handcuffed the Defendant at or around 2:50 a.m., the information he possessed included a suspicious-looking female, rummaging through a messy car in the early morning hours at Guma Trankilidat. He also recalled a reported burglary at Guma Trankilidat the week before the Defendant's arrest. In addition, the Defendant informed Sumagaysay of two different names and that she lived in Maite.

During the Suppression Hearing, neither Sumagaysay nor Pangelinan indicated that the Defendant put them in fear for their individual safety or that of their fellow officers. For instance, neither officer testified in court or stated in their police reports that the Defendant had a weapon or suspected that she was armed and presently dangerous.

After handcuffing her, the Defendant gave him the name "Linda Vargas" as another form of identification. *See* Suppression H'rg Mins. at 3:28:00 – 28:28PM (Dec. 12, 2024). But he

confirmed that her real identity was "Sunni Vargas." *Id.* Ascertaining Defendant Vargas' identity is a sufficient purpose for detaining her under 8 GCA § 30.20.

In regards to Sumagaysay's reasonable suspicion that the Defendant committed or was committing a crime, he testified that he handcuffed the Defendant based on her refusal to stop, inability to identify the vehicle's owner, and possible break-in of a messy vehicle. *See* Suppression H'rg Mins. at 3:27:39 – 27:53PM (Dec. 12, 2024). The court is concerned with Sumagaysay's initial purpose for her detention made on the record: her refusal to stop. Throughout the Suppression Hearing, Sumagaysay either testified or agreed with counsel several times that he handcuffed her, because she would not stop. For instance, when the People asked when he placed the Defendant in handcuffs, Sumagaysay replied that it was "after she kept refusing to stop." Suppression H'rg Mins. at 3:26:45 – 26:50PM (Dec. 12, 2024). When explaining his reasons for handcuffing her, Sumagaysay testified as to three reasons: "she refused to stop;" the officers' inability to identify the owner of the vehicle; and to determine whether she was breaking into the vehicle. *Id.* at 3:27:39 – 27:53PM. When cross-examined, Sumagaysay testified again that he handcuffed her because she would not stop:

> GAYLE: Because he kept instructing her to stop, as she was heading towards K building... that she never stopped, then you put her hands in handcuffs. Is that correct?
>
> OFFICER SUMAGAYSAY: Yes ma'am.
>
> GAYLE: At the moment you put the handcuffs on her, was she under arrest?
>
> OFFICER SUMAGAYSAY: Yes ma'am.
>
> GAYLE: Okay, and what was the charge?
>
> OFFICER SUMAGAYSAY: Uh, Possession.
>
> GAYLE: That's not what you said. You said 'she wouldn't stop.' Then, you put the handcuffs on her. Is that what you testified to?

OFFICER SUMAGAYSAY: I did.

Suppression H'rg Mins. at 3:52:20 – 53:11PM. Without more information regarding the crime that he believed she was committing or already committed, he should not have detained her merely for her refusal to stop and answer his questions. Although Sumagaysay said that they could not identify the vehicle's owner, his testimony did not prove that the Defendant was unable to identify the owner. She simply ignored the same questions about the vehicle's owner after previously indicating that "Dan" owned the vehicle she was found in.[12] Magistrate's Compl. (Oct. 21, 2024).

Sumagaysay testified that the officers "were not finished investigating why she was in the car parked in a handicapped stall." Suppression H'rg Mins. at 3:50:00 – 50:47PM. Based on the Defendant's occupancy within the messy vehicle, and her lack of physical identification at the time, he testified that he "could've made an investigation for burglary." *Id.* When asked about the results of this investigation, Sumagaysay could not recall information regarding this messy vehicle, even with his police report to refresh his recollection. For instance, he could not recall: the vehicle's registered owner after calling in the license plate; checking the physical copy of the registration in the vehicle; or whether the car had a handicapped-accessible parking stall placard. *See* Suppression H'rg Mins. at 3:43:02 – 50:47PM.

When looking at the contents and reliability of this information, it is still unclear what crime Sumagaysay believed he had reasonable suspicion to detain the Defendant for. Although Sumagaysay stated that he "could've made an investigation for burglary," it is unclear whether he actually conducted an investigation into the Defendant's commission of a burglary when

---

[12] The driver is not required to answer such questions, *see Royer*, 460U.S. at 497-98, 103 S.Ct. at 1324, just as surely he is not required to submit to a request to search. *See People v. Chargualaf,* 2001 Guam 1 ¶ 24 n.3.

Substance. *Id.* at 3:52:20 – 53:11PM. However, Pangelinan did not inform him about the suspected methamphetamine pipe and resealable baggie until *after* she was cuffed.

After reviewing all this information through a reasonably objective police officer's perspective, it is not likely that Officer Sumagaysay had enough reasonable suspicion that the Defendant committed, was committing, or was about to commit a burglary or theft. Because Officer Sumagaysay did not have enough reasonable suspicion to detain the Defendant for burglary, her detention was therefore unlawful.

### C. Guam Police Department Officers conducted an unlawful, warrantless search of the vehicle.

Before ruling on the suppression of evidence in this case, the court must look at whether Officer Pangelinan unlawfully seized the evidence found in the vehicle. Although Pangelinan did not have a warrant to search the vehicle, he testified that he observed, through the open driver's window, a pipe with a bulbous end *in plain view* inside the "car's center console compartment, which was open." *Id.* at 4:01:50 – 07:07PM; 4:20:10 – 21:23PM (emphasis added). After removing the pipe, he also found a resealable baggie containing a crystalline substance in that same compartment. *Id.*

To apply the Plain View Doctrine as an exception to a warrantless search, all three of the following elements must be satisfied: "(1) the officer must 'arriv[e] at the place from which the evidence could be plainly viewed' without violating the Fourth Amendment, (2) the evidence must be in 'plain view' and its incriminating character must also be immediately apparent, and (3) the officer 'must also have a lawful right of access to the object itself.'" *People v. Camacho*, 2004 Guam 6 ¶ 20 (quoting *Horton v. California*, 496 U.S. 128, 136-67, 110 S.Ct. 2301, 2308).

Although it is the People's burden to prove that the warrantless search was lawful, the court denied the People's request to submit arguments on the Motion to Suppress pursuant to its

(3) the officer 'must also have a lawful right of access to the object itself.'" *People v. Camacho*, 2004 Guam 6 ¶ 20 (quoting *Horton v. California*, 496 U.S. 128, 136-67, 110 S.Ct. 2301, 2308).

Although it is the People's burden to prove that the warrantless search was lawful, the court denied the People's request to submit arguments on the Motion to Suppress pursuant to its ruling during the Suppression Hearing. However, the court still has an obligation to analyze the merits of whether this evidence, seeking to be suppressed, was lawfully obtained. *See Quitugua*, 2004 Guam 19 ¶¶ 27–28.

As to the first element, Pangelinan got out of the patrol car and stood outside of the vehicle in question, which was parked in Guma Trankilidat's parking lot. However, the Defendant had already shut the driver's side door and left the vehicle, with the other two officers following her. Prior to finding the evidence, Pangelinan testified that he had no role in this investigation; Sumagaysay was the lead officer in this incident and Togawa acted as Sumagaysay's backup. *See* Suppression H'rg Mins at. 4:18:40 – 19:39PM (Dec. 12, 2024). During his testimony, Pangelinan did not explain why he looked into the vehicle *after* the Defendant already walked some distance away from it. Without more information as to why he found himself standing next to the vehicle in question, there would have been no lawful reason for Pangelinan to look into the vehicle with his flashlight and retrieve the suspected pipe and methamphetamine. Because he was not in a place from which the evidence could be plainly viewed without violating the Fourth Amendment, the first element is not met.

As to the second element, Pangelinan testified that he saw the pipe with a bulbous end from the vehicle's open center console compartment as he shined his light inside the compartment. *See* Suppression H'rg Mins. at 4:22:44 – 24:30PM (Dec. 12, 2024). Although he testified that the driver's side window was down, it is not likely that the evidence was immediately

apparent if Pangelinan only viewed the suspected pipe and baggie while shining his flashlight into the vehicle; in the parking lot with "lights illuminating the area." *Id.* at 4:19:40 – 20:08PM. Therefore, second element is not met.

As to the third element, Pangelinan found evidence of illegal contraband for suspected methamphetamine-use in the vehicle. But because the court found above that he was not in a place where the illegal contraband could be plainly viewed without violating the Fourth Amendment, and such contraband was not immediately apparent, Pangelinan had no lawful right to access the illegal contraband. Therefore, the third element is not met.

Because all three elements were not met, the court finds that the evidence was not found in the GPD Officer's plain view. Therefore, the search of the vehicle was unlawful.

**D. Guam Police Department Officers conducted an unlawful arrest of Defendant Vargas.**

The next issue is whether GPD conducted a lawful arrest of the Defendant while detaining her without sufficient reasonable suspicion that she committed a burglary. "If at any time after the onset of the detention authorized by § 30.10, probable cause for arrest of the person shall appear, the person shall be arrested." 8 GCA § 30.40. As mentioned above, the court found that the Defendant's detention was unlawful without reasonable suspicion that she committed a crime; meaning that this detention was not authorized by 8 GCA § 30.10.

During the Suppression Hearing, neither officer clearly testified as to the specific crime Sumagaysay arrested the Defendant for. Based on Pangelinan's testimony, Sumagaysay arrested the Defendant *after* Pangelinan informed the other two officers about the evidence he found: a glass pipe with a bulbous end containing residue; and a clear, resealable baggie containing a crystalline substance. As the arresting officer, Sumagaysay stated that he arrested her because she

would not stop. At another point, he testified that he arrested her for Possession before conceding to his previous testimony that he arrested her because "she wouldn't stop."[13]

Because the court found that the officers lacked reasonable suspicion to detain the Defendant for the crime of burglary, it would have been unlawful to arrest her for burglary, absent probable cause. Although Pangelinan discovered evidence of suspected methamphetamine-use in the vehicle, the court also found above that he obtained the evidence unlawfully. So, an arrest for Possession of a Schedule II Controlled Substance would also have been unlawful. In either event and without more information, the court finds that the arrest of the Defendant was therefore unlawful.

**E. The evidence found from the unlawful search must be suppressed as Fruit of the Poisonous Tree.**

The last issue is whether the evidence derived from the unlawful, warrantless search of the vehicle in question must be suppressed under the Fruit of the Poisonous Tree Doctrine. *See Wong Sun v. United States*, 371 U.S. 471 (1963). In this case, the Defendant seeks to suppress anything found "after the initial illegal stop." Suppression H'rg Mins. at 4:35:38 – 35:53PM (Dec. 12, 2024).

Evidence may be suppressed under the Fruit of the Poisonous Tree Doctrine once the court determines "whether the challenged evidence was come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *People v. Cundiff*, 2006 Guam 12 ¶ 4 (internal citations omitted). In *this* case, the court must determine whether Officer Pangelinan exploited the Defendant's unlawful detention to come by the bulbous pipe and resealable baggie of suspected methamphetamine in the vehicle.

---

[13] *See* Suppression H'rg Mins. at 3:52:20 – 53:11PM.

Here, Officer Pangelinan was not involved in the Defendant's detention or any interaction with her. Based on his testimony, Pangelinan approached the vehicle after the Defendant exited and was walking towards the overhang/laundry area with Sumagaysay and Togawa following her. *See* Suppression H'rg Mins. at 4:18:40 – 19:39PM (Dec. 12, 2024). As mentioned earlier, Pangelinan did not explain why he looked into the vehicle only after the Defendant already walked some distance away from it. Without additional information to prove otherwise, it is not likely that Officer Pangelinan would have looked into the vehicle and found the challenged evidence if the Defendant and the two other GPD officers remained at the vehicle. Therefore, the challenged evidence – the bulbous pipe and resealable baggie of suspected methamphetamine – are fruit of the poisonous tree and must be suppressed from trial.

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

## CONCLUSION

For the reasons set forth above, the court holds the following:

1. That Defendant Vargas' seizure did not result in a violation of 8 GCA § 30.30;

2. That Defendant Vargas' detention was unlawful for lack of reasonable suspicion that the Defendant was committing or committed a crime;

3. That Defendant Vargas' arrest was unlawful for lack of probable cause that the Defendant was committing or committed a crime;

4. That the warrantless search of the vehicle, which Defendant Vargas was found in, was unlawful; and

5. That the evidence seized in this matter must be suppressed as Fruit of the Poisonous Tree.

Therefore, the court hereby **GRANTS** the Defendant's Motion to Suppress. The court hereby **ORDERS** that the evidence of the bulbous pipe and resealable baggie of suspected methamphetamine shall be **SUPPRESSED** from trial.

**SO ORDERED** this ___MAR 1 2 2025___ .

SERVICE VIA E-MAIL
I acknowlegde that an electronic
copy of the original was emailed to:
AG's, APD

3/12/25 Time: 528 PM.
Elaa Mejar
Deputy Clerk, Superior Court of Guam

**HONORABLE ALBERTO E. TOLENTINO**
Judge, Superior Court of Guam